Argued September 30, affirmed October 13, rehearing denied November 10, 1914.

## COOPEY *v.* KEADY.

(144 Pac. 99.)

**Release—Definition.**

1. A "release" is a relinquishment, concession or giving up of a right, claim or privilege, by the person in whom it exists or to whom it accrues, to the person against whom it might have been demanded or enforced.

**Release—Formal Requisites—Seal.**

2. Under Section 778, L. O. L., providing that an agreement in writing without a seal in the compromise or settlement of a debt or controversy is as obligatory as if a seal were affixed, a release is effective without a seal, though one was necessary at common law.

[As to seal as imparting consideration, see note in Ann. Cas. 1913A, 365.]

**Release—Operation and Effect.**

3.  A valid release completely discharges and extinguishes all rights and claims of the releasor against the releasee that are covered by the release.

**Release—Construction and Operation—Particular Provisions.**

4.  Under Section 715, L. O. L., providing that in the construction of an instrument the office of the judge is simply to ascertain and declare what is, in terms or substance, contained therein, not to insert what has been omitted, or omit what has been inserted, and Section 716, providing that in the construction of contracts the intention of the parties is to be carried out if possible, a release by a broker to other brokers, in consideration of the payment of a certain commission by the principal of all obligations to pay the releasor commissions they may receive from the principal, as well as all other obligations arising out of the transaction, or otherwise prior to the date of the release, was an adjustment of all matters up to the date of its execution barring any action or suit for commissions or for anything done prior to the execution of the release, and it was a settlement as to the amount to be paid to the releasor in the event of sale under the option of sale then granted by the principal.

**Release—Construction and Operation.**

5.  The rule for construing a release is the same in equity as it is in law.

**Release—Construction—Scope and Extent.**

6.  Where plaintiff, a broker, in consideration of the agreement of the principal to pay him a certain commission on a sale of land, if completed under the terms of an option then granted by the principal, released the defendant brokers, with whom he had been associated, from all claims for commissions arising prior to the date of the release or from the sale under the option, but the land was not sold under the option, but the defendant, with the aid of other brokers, made a sale several months later, plaintiff is not entitled to recover a share of the commissions received by defendants from the purchasers.

> [As to when a broker becomes entitled to a commission, see note in 28 Am. St. Rep. 546.]

From Multnomah: GEORGE N. DAVIS, judge.

This is a suit by Charles Coopey against L. Y. Keady, A. F. Swensson, Pacific Realty Company, a corporation, W. J. Burns and L. Y. Keady Investment Company. From a decree for defendants, plaintiff appeals.     AFFIRMED.     REHEARING DENIED.

For appellant there was a brief over the names of *Mr. W. Y. Masters* and *Messrs. Sinnott & Adams,* with oral arguments by *Mr. Masters* and *Mr. B. B. Sinnott.*

For respondents there was a brief over the names of *Messrs. Griffith, Leiter & Allen* and *Messrs. Veazie, McCourt & Veazie,* with oral arguments by *Mr. Harrison Allen* and *Mr. Arthur L. Veazie.*

Department 1.   MR. JUSTICE RAMSEY delivered the opinion of the court.

The complaint alleges, *inter alia,* in substance, that during the years of 1911 and 1912, and part of 1913, and long prior thereto, the Oregon Real Estate Company, a corporation, was the owner of 858 lots in Wheeler's and Holladay's Additions to the City of Portland, and some outside property; and that Charles X. Larrabee was the president of said company; that during the year 1911 the plaintiff was negotiating with Charles X. Larrabee for an "option" to sell said lots, and that said Larrabee, as president and manager of said company, had agreed with the plaintiff to give him an "option" to sell said lots and other property at the price of $2,500,000, and to allow the plaintiff a commission of $500,000 for making said sale; that for the purpose of negotiating said sale and taking said "option," the plaintiff associated the defendants L. Y. Keady and A. F. Swensson with him in said transaction, and that the plaintiff and said defendants took said "option" from said Oregon Real Estate Company for the sale of said lots and entered into negotiations for the sale thereof; that the defendants and the plaintiff negotiated for the sale of said property from the time of taking said "option," and obtained extensions of said "option," and after the expiration of said extensions, the plaintiff and the defendants still negotiated for the sale of said property, with the understanding and agreement that the plaintiff and the defendants were to be equally interested in the com-

missions to be obtained upon said sale; that through
said negotiations a purchaser was procured for said
property, and the plaintiff and said defendants be-
came and were entitled to a commission on the same;
that the defendants L. Y. Keady and A. F. Swensson
have refused, and still refuse, to inform the plaintiff
as to the exact amount of commissions received on said
sale, but the plaintiff is informed and believes, and
therefore alleges the fact to be, that a commission of
$250,000 was received upon the sale of said property,
and said defendants L. Y. Keady and A. F. Swensson
refused to account to plaintiff for his share of said
commissions, or any part thereof, or to inform the
plaintiff as to the final terms of said sale.

The complaint alleges also, in substance, that the
plaintiff is informed and believes that said lots are to
be conveyed to the Anglo-Pacific Realty Company, and
the commission on said sale is to be paid part in cash
and part in stock of said company, and that it is the
intention of said L. Y. Keady and A. F. Swensson to
have said money and stock transferred to them or to a
person designated by them, so that the plaintiff cannot
procure or collect his share of said commission, etc.
The complaint asks for an injunction restraining the
defendants from selling or disposing of the stock or
money received by them or due them for said commis-
sions on said sale, for an accounting, etc.

Said defendants filed an answer denying much of
said complaint and alleging, *inter alia,* the following:

"That during the years 1911 and 1912, and prior to
the 4th day of December, 1912, the plaintiff and de-
fendants L. Y. Keady and A. F. Swensson have been
endeavoring to make a sale of certain real property of
the Oregon Real Estate Company, but without success,
when on, to wit, the said 4th day of December, 1912,
various disputes having arisen between the plaintiff

and these answering defendants, L. Y. Keady and A. F. Swensson, concerning the attempted sale of said property, and the division of commissions between them in the event of such sale, and the said parties having disagreed and determined to effect a complete settlement between themselves with reference to their association with each other, their efforts with reference to said property, the plaintiff, Charles Coopey, made, executed and delivered to these defendants a full and complete release of all claims and demands on account of said property and commissions with reference to the sale of said property, which release was and is in words and figures as follows, to wit:

" 'A dispute having existed between myself and L. Y. Keady and A. F. Swensson about my share of the commissions to be paid us by the Oregon Real Estate Company upon a sale proposed to be made by it of certain real property, and the said dispute having been satisfactorily settled, now, in consideration thereof, and of the assumption by the Oregon Real Estate Company of the payment to me of the sum of seventy thousand dollars ($70,000.00) in full for my share of said commission, if the sale shall be completed, and the commission earned, I hereby release the said L. Y. Keady and A. F. Swensson from all obligations to me for any part or share in the commissions they may receive from the said Oregon Real Estate Company, as well as all other obligations that might arise or be claimed by me arising out of said transaction or otherwise prior to this date.          CHAS. COOPEY.

" 'And on the same premises and for the same consideration, we release Charles Coopey from all obligations prior to this date.          L. Y. KEADY.
" 'A. F. SWENSSON.

" 'Dec. 4th, 1912.'

"That at the time of the execution of said release, and immediately thereafter, the Oregon Real Estate Company, an Oregon corporation, and the one mentioned in said release, did enter into the agreement with the plaintiff which is mentioned in said release

wherein and whereby the said Oregon Real Estate Company assumed and agreed to pay to the plaintiff the sum of seventy thousand dollars ($70,000), which payment was to be in full of the share of the plaintiff for all commissions to be earned by him in the event of a sale of the said property, and in consideration of the execution and delivery to the plaintiff by the said Oregon Real Estate Company of the agreement aforesaid and in settlement of all of their affairs, the plaintiff released these defendants, L. Y. Keady and A. F. Swensson, from any and all obligations to him of every kind and character on account of any commissions that they or either of them might receive from the Oregon Real Estate Company on account of the sale of said property, as well as all other obligations which might arise or be claimed by the plaintiff on account of any transactions had by the plaintiff and these defendants with reference to the real estate aforesaid, and these defendants in consideration of the premises and as expressed in said release, released and discharged the plaintiff from all obligation to them and each of them on account of the said property or the sale thereof, and commissions to be earned thereby.

"That by the terms of said settlement and the execution and delivery of said release, all claims and demands of the plaintiff against these defendants and each of them were fully paid, satisfied and discharged, and these defendants have never since the said 4th day of December, 1912, at any time made or entered into any contract or agreement, or had any understanding whatsoever with the plaintiff with reference to the sale of said real estate or any part thereof, or its sale to or purchase by the Anglo-Pacific Realty Company, or any other person, firm, or corporation whatsoever, and these defendants allege that, if there is now anything due to the plaintiff on account of the sale of said real estate, it is due to him from the Oregon Real Estate Company as by the terms of said agreement provided, and not otherwise, and these defendants, nor either of them, are indebted to the plaintiff in any sum

or amount whatsover, or liable to account to him for any commissions with reference to the sale of said real estate.''

The plaintiff filed a reply denying parts of the answer and setting up affirmative matter. The court below made findings and entered a decree sustaining the defense pleaded in the answer. The plaintiff appeals, and asks for a decree in his favor on the facts. The evidence is lengthy, but much of it is incompetent. However, we have examined the evidence.

The following is a summary of the facts shown by the evidence:

''The Oregon Real Estate Company, of which Mr. C. X. Larrabee was president, manager and principal stockholder, was the owner of 858 lots in the City of Portland and certain outside property. The company desired to sell said property, and numerous 'options' had been given during the two or three years prior to 1911 to various persons who desired to find purchasers. In 1911 Mr. Coopey, the plaintiff, who appears to have been in friendly relations with Mr. Larrabee, conceived the idea of taking one of these 'options' and trying to sell the property. He broached the subject to Mr. A. F. Swensson, a real estate broker, and, after making an extended examination of the property, Mr. Swensson agreed to take the matter up. In August, 1911, they procured a joint option to themselves, accompanied by a letter fixing the commission that would be paid in case of a sale. They made some efforts to find a purchaser. In March, 1912, Mr. L. Y. Keady, another real estate agent, who had some connection with brokers in Victoria, British Columbia, through whom it was hoped a purchaser might be found, was taken into the arrangement. Mr. Larrabee would give only short 'options' and they expired and were renewed several times. The only relations that existed between them were such as arose by virtue of their taking the 'options' or contracts jointly from the Oregon Real Estate Company with the understanding that Keady

and Swensson would try to find a purchaser, and if
they closed the sale and earned the stipulated commis-
sion, the net proceeds, after deducting the expenses
and the commissions paid to other agents, would
be divided between the three, to wit, Coopey, Keady
and Swensson.   Matters continued on this basis until
November, 1912.   The parties held an 'option' which
expired on the 18th of November.   About that time,
through the efforts of brokers in Victoria whom Mr.
Keady had enlisted, prospective purchasers were found
in London, who cabled $100,000 to Portland as evidence
of good faith.   In order to go on with the deal it was
necessary to get a new 'option.'   Coopey, Keady and
Swensson had been having disagreements and disputes
as to their relations with the deal.   The 'option' which
had just expired provided for a gross commission of
$469,570.43, in case of a sale at $2,500,000, which was
the price the London syndicate was considering.   To
get a new 'option' and to settle their disputes with each
other, the parties met in the office of Martin L. Pipes,
Esq., on the 4th day of December, 1912.   Mr. Larrabee
had been told of the prospect that the English syn-
dicate would buy, and that they had remitted the
$100,000.   Mr. Coopey also knew these facts.   Mr.
Larrabee was unwilling to do more than execute a
renewal of the option for ten days—to wit, until De-
cember 14, 1912.

"At the same time that the new 'option' was given
to run ten days, two written contracts respecting the
commission were executed by the Oregon Real Estate
Company; one a contract with Mr. Coopey agreeing to
pay him $70,000 in case the sale should be closed in the
ten days; and the other with Keady and Swensson
agreeing to pay them $430,000 (less a deduction for
taxes) on like terms.   As part of the same transac-
tion, a mutual release was executed between Coopey,
on the one part, and Keady and Swensson, on the
other, of which the following is a copy:

" 'A dispute having existed between myself and L.
Y. Keady and A. F. Swenson about my share of the
commissions to be paid us by the Oregon Real Estate

Company upon a sale proposed to be made by it of certain real property, and the said dispute having been satisfactorily settled, now, in consideration thereof, and of the assumption by the Oregon Real Estate Company of the payment to me of the sum of seventy thousand dollars ($70,000), in full for my share of said commission, if the sale shall be completed, and the commission earned, I hereby release the said L. Y. Keady and A. F. Swensson from all obligations to me for any part or share in the commissions they may receive from the said Oregon Real Estate Company, as well as all other obligations that might arise or be claimed by me arising out of said transaction or otherwise prior to this date.

" 'December 4, 1912.

" '[Signed]    Chas. Coopey.

" 'And on the same premises and for the same consideration, we release Charles Coopey from all obligations prior to this date.

" '[Signed]    L. Y. Keady.

" 'A. F. Swensson.' "

At the time said release was executed the Oregon Real Estate Company executed to the plaintiff its agreement to pay him his part of the commission in the following words:

"The Oregon Real Estate Company, having proposed to sell certain of its real property by a proposal of even date herewith made to L. Y. Keady, and L. Y. Keady, A. F. Swensson, and Charles Coopey having interests in the commission to be paid on the proposed sale if completed according to the terms of said proposal, about which commissions a dispute arose between said parties, and the said dispute having been satisfactorily settled by them: Now, therefore, as a part of said settlement, the Oregon Real Estate Company agrees with Charles Coopey to pay to him the sum of seventy thousand dollars ($70,000) as commission for said sale (the said sum having been deducted from the commissions to be paid to L. Y. Keady and

A. F. Swensson), subject, however, to the same terms as to payment as provided in the contract of the said company with said L. Y. Keady and A. F. Swensson of even date herewith, the payment of $70,000 to be made as follows: $8,333.33 out of the first payment of $500,000 to be paid by the purchaser, when paid according to the said proposal; $12,500 out of the second payment; $12,500 out of the third payment; $36,666.67 out of the last payment.    Each payment to be made at the time of the payments by the purchaser as aforesaid.

"December 4, 1912.
"THE OREGON REAL ESTATE COMPANY,
"By C. X. LARRABEE,
"President."

At the same time that the foregoing instruments were executed, the Oregon Real Estate Company gave an "option" for the sale of said real property to L. Y. Keady for the period of ten days from December 4, 1912, upon certain terms specified therein.    The purchase price was to be $2,500,000.    Said "option" provided that time should be of the essence of the offer.

At the same time the Oregon Real Estate Company made a contract with L. Y. Keady and A. F. Swensson that upon the sale of said real property according to the terms of said "option" it would pay to them, as commissions for making said sale, $430,000.    Said company agreed to pay the plaintiff, as stated *supra,* $70,000, if said real property should be sold in accordance with the terms of said "option"; the total commissions agreed to be paid being $500,000.    There was to be some deduction made from the amount payable to Keady and Swensson for taxes.    The release, the "option," and the contract referred to *supra* were executed at the same time and place and constituted one transaction.

1. The first question for consideration is as to the meaning and effect of said mutual release set out *supra*. The plaintiff in his brief admits that no sale was made under said "option" obtained on December 4, 1912. A release is a relinquishment, concession or giving up of a right, claim or privilege, by the person in whom it exists or to whom it accrued, to the person against whom it might have been demanded or enforced: Black's Law Dictionary (2 ed.), p. 1011; 34 Cyc. 1042.

2. At common law a seal was necessary to constitute a release; but where a contract in the form of a release is based on a valuable consideration, it will constitute a release in effect, although not under seal: 34 Cyc. 1045, 1046. Section 778, L. O. L., is as follows:

"An agreement in writing, without a seal, for the compromise or settlement of a debt or controversy, is as obligatory as if a seal were affixed."

3. The "release" set out *supra* is not under seal; but it is as effective as it would be if it were sealed. A valid release completely discharges and extinguishes all rights and claims of the releasor against the releasee that are covered by the release.

24 Am. & Eng. Ency. Law (2 ed.), page 315, says:

"A valid release is binding upon the parties and is an absolute bar to any right of action growing out of the original obligation."

In *Retzer* v. *Dold Packing Co.*, 58 Mo. App. 270, the court says:

"It seems to us that there is logically involved in these contentions and admissions of the plaintiff the concession that the release pleaded is valid and binding on the plaintiff. It is certainly not without ample consideration for its support. It must inevitably follow that the release is an absolute bar to any right of

action growing out of the injury complained of, unless avoided for fraud or other cause."

34 Cyc. 1077 says:

"A valid release as conclusively estops the parties from reviving and litigating the claim released as a final judgment, and it forever extinguishes a personal right of action. It completely discharges and extinguishes all rights and claims of the releasor against the releasee which are included in the release."

The same volume, on page 1075 thereof, says:

"It has been held that the rules as to the construction and meaning of a release are the same at law as in equity. The primary rule of construction of all contracts and deeds, including releases, is that the intention of the parties must govern. This intention must, however, be collected from the words used in the instrument, and not from matters *dehors* the writing."

On page 1076 of the same volume the rule of construction is further stated thus:

"A release should be construed from the standpoint of the parties at the time of its execution, and extrinsic evidence is admissible to show their surrounding curcumstances, and the nature of the transaction to which it was intended to apply; and the particular purpose for which it was executed should be kept in mind and given effect to, *if it can be done without adding* (to) *or subtracting anything from the words used by the parties to the instrument.*

"For the proper construction of an instrument, the circumstances under which it was made, including the situation of the parties to it, may be shown, so that the judge be placed in the position of those whose language he is to interpret."

4. Section 715, L. O. L., is as follows:

"In the construction of a statute *or instrument,* the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what

has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all.''

In the construction of contracts, the intention of the parties is to be carried out, if possible: Section 716, L. O. L. In the light of the attending circumstances, what did the parties intend to accomplish by the execution of the mutual release set out *supra?* That it was based upon a sufficient consideration and was valid is not disputed; but the parties disagree as to its meaning and effect. The court must determine its meaning by the words used, in the light of the circumstances attending its execution.

The release recites that a dispute existed between the plaintiff and Keady and Swensson as to the plaintiff's share of the commissions to be paid to those parties by the Oregon Real Estate Company upon a sale proposed to be made by it, of certain real property, and, the said dispute having been satisfactorily settled, the release states:

''Now in consideration thereof, and of the assumption by the Oregon Real Estate Company of the payment to me of the sum of $70,000 in full of my share of said commission, if the sale be completed, and the commission earned, *I* (the plaintiff) *hereby release the said L. Y. Keady and A. F. Swensson from all obligations to me for my part or share in the commissions they may receive from the said Oregon Real Estate Company, as well as all other obligations that might arise or be claimed by me arising out of said transaction, or otherwise prior to this date.''*

The plaintiff signed said release. Following his signature, the defendants at the same time, and as a part of said release, subscribed the following:

''And on the same premises and for the same consideration, we release Charles Coopey (plaintiff) *from all obligations prior to this date.''*

The plaintiff released the defendants from all obligations for his part in the commissions that they might receive from the Oregon Real Estate Company, as well *as all other obligations that might arise or be claimed by him* arising out of said transaction or otherwise prior to the time that said release was signed. He did that, as is shown by said release, for the reason that the Oregon Real Estate Company had, at the same time, bound itself to pay him, as his part of the commissions on the proposed sale the sum of $70,000, if said sale should be made according to the terms of the "option" for the sale of said land given at that time. In other words, the plaintiff released the defendants and agreed to look to the Oregon Real Estate Company for the payment of his commissions, and that company agreed to pay him his part thereof —$70,000—*if* the land should be sold in accordance with the terms of the "option" given when said release was executed.

It is not claimed that any land had been sold under previous "options," or that any commissions had been earned under "options" granted prior to December 4, 1912. We hold that the release referred to was a complete adjustment of all matters up to the date of its execution, and that it is a bar to any action or suit for commissions or for anything done prior to the execution of said release, and that it was a settlement and adjustment as to the amount of commissions that the plaintiff should receive on the sale of the realty of said company and as to who should pay it, if said realty should be sold under and in accordance with the "option" granted by said company on December 4, 1912. Said release is a bar to any action or suit by the plaintiff against Keady and Swensson for the recovery from them of any commissions for any sale

under said "option" of December 4th, because it releases them therefrom.

The plaintiff sets forth his contention thus in his brief:

"No sale of property was made under these agreements, and no commission was earned by Keady or Swensson thereunder, and consequently the conditions under which the Oregon Real Estate Company was to pay Mr. Coopey $70,000 commission were never fulfilled and no commission was paid him. It was the contention of appellant that, 'taken by their four corners,' and considered in a court of equity where the intention of the parties governs, these agreements show that they were only intended to apply to the sale then in contemplation, and it was not the intention of the parties that if the sale then in contemplation should not be consummated, that Keady and Swensson were to be entitled to appropriate to themselves the fruits of the combined efforts of the three parties for upwards of two years, and leave Mr. Coopey, who had inaugurated the enterprise, without anything. He also claims that the subsequent action of the parties, which we shall point out later, also shows that this was not the understanding."

5. The rule for construing documents of this kind is the same in equity as it is at law.

6. The mutual release executed by the parties, and set out *supra,* was a settlement of all claims that the plaintiff might make on account of the "fruits of the combined efforts of the three parties for upward of two years," relating to commissions for attempts to sell said real estate prior to December 4, 1912, and he cannot be heard now to make any claim therefor. Furthermore, the evidence shows that the efforts of the plaintiff and the defendants to sell said real property prior to the execution of said release were fruitless. No sales were made and no commissions were

earned. All their contracts or "options" for the sale
of the property had expired. The evidence shows that
the contract or "option" for the sale of said property
that was given by said company on December 4, 1912,
expired in ten days from that date, and that it was
never renewed or extended. When the release was
executed, the plaintiff and the defendants had pro-
spective purchasers in view, to whom they believed
the property could be sold within the ten days allowed
for making a sale, but the prospective sale failed.
Negotiations continued after the time allowed by the
contract for making the sale expired. The defendants
were unable to induce the Oregon Real Estate Com-
pany to extend the time for selling the property, and
they requested the plaintiff to see the president and
manager thereof, and to obtain from him an extension,
or a renewal, of said contract, if possible, and the
evidence shows that neither the plaintiff nor the de-
fendants could induce said company to extend or re-
new said contract or "option." The company, after
the expiration of the ten days, refused to sell said
property for the price agreed upon in the contract of
December 4, 1912. That contract expired by limita-
tion on December 14, 1912. Several months later the
land was sold for $2,225,000, practically all net to the
company. Under the contract of December 4th the
company was to receive $2,500,000; but it was bound
to pay of that amount $70,000 to the plaintiff, and
$430,000 to the defendants, as commissions. Under the
contract by which the property was finally sold, the
company paid no commissions to anyone. Under the
contract of December 4th, the *vendor* was to pay all
commissions. Under the final contract of sale, the
*vendee* paid all the commissions.

Brokers from England and British Columbia figured largely in making the sale, and shared in the commissions paid by the corporation that purchased the property. The defendants received from the vendees as commissions $25,000 in cash and $125,000 in the corporate stock of the vendee. A part of said commissions they paid to others for assistance.

We are unable to find any facts upon which to base a decree for the plaintiff. The defendants never agreed to pay the plaintiff any part of these commissions. They agreed to divide commissions with him under the contracts made prior to December 4th, but no sales were made or commissions earned under those contracts, and hence there was nothing to divide. The last contract that was made for the payment of commissions to the plaintiff was made by the Oregon Real Estate Company on December 4th, and it was conditional on the property's being sold in ten days from that date. The evidence fails utterly to show that the defendants agreed to pay the plaintiff any part of the commissions that they should receive for their services in assisting in making the sale that was finally made. There is no evidence that would justify a decree in favor of the plaintiff.

We are sorry that we can find no facts that would authorize us to render a decree that would enable the plaintiff to obtain a good portion of the large amount of money that the vendee so liberally distributed among the brokers as commissions.

We approve the findings of the court below.

The decree of the court below is affirmed.

AFFIRMED.    REHEARING DENIED.

MR. JUSTICE BEAN, MR. JUSTICE BURNETT and MR. JUSTICE MOORE concur.