Respondents motion to strike brief March 13, denied April 3,
argued October 28, 1957, affirmed January 29, 1958

## McCARTY *v.* HEDGES ET AL

309 P. 2d 186
321 P. 2d 285

Frank H. Pozzi, Portland, for the motion.

Cunning, Brewster & Copenhaven, Redmond; Koerner, Young, McColloch & Dezendorf, John Gordon Gearin, and Joseph Larkin, Portland, contra.

KESTER, J.

This is an action for damages for personal injuries in which plaintiff recovered a judgment against both defendants. Each defendant separately has appealed from the judgment. Defendant Hedges has filed his combined abstract and opening brief, and plaintiff now' moves to strike that brief on the ground that it contains only immaterial matters in that there is no bill of exceptions before the court, and that the brief does not contain page references to the bill of exceptions as required by Rule 16 of the rules of this court.

The record shows that the judgment was signed September 21, 1956, and docketed September 24, 1956, and both notices of appeal were filed November 20, 1956. Defendant Brohlin's undertaking was filed November 20, and his appeal became perfected on November 25, 1956 (ORS 19.030-4). Defendant Hedges' undertaking was filed November 30, and his appeal became perfected December 5, 1956. Defendant Hedges filed his short transcript with this court on December 21, 1956, which was within the statutory thirty days from perfecting his appeal (ORS 19.070). Defendant Brohlin obtained an extension of time from the trial court until February 12, 1957, to file his short tran-

script, and filed it with this court on February 8, 1957, with the judgment roll and with the bill of exceptions hereinafter mentioned.

Defendant Brohlin obtained successive extensions of time from the trial court for tendering a bill of exceptions until January 28, 1957. On January 22, 1957, the trial court signed, and on January 24, 1957, there was filed with the clerk of the trial court, a bill of exceptions which had been tendered by defendant Brohlin, and which incorporated by reference the full transcript of testimony in two volumes, marked Exhibits "A" and "B." The bill of exceptions, including Exhibits "A" and "B," bears an acceptance of service by plaintiff's attorneys dated January 14, 1957.

In the meantime, defendant Hedges on December 22, 1956, filed with the Supreme Court a motion for an extension of time to file a bill of exceptions. This motion was opposed by plaintiff on the ground that the sixty-day period for tendering a bill of exceptions had already expired, and that no application for extension had been made within that period. Not being advised of the extension already granted in the circuit court, this court on January 4, 1957, denied the motion of defendant Hedges.

Respondent's present motion is seemingly based upon the premise that each appellant must tender and have settled a separate bill of exceptions. No other basis for the motion appears, as appellant Hedges' brief does make page references to the transcript of testimony which is incorporated in the bill of exceptions submitted by appellant Brohlin. This premise is incorrect, however, as our practice does not contemplate more than one bill of exceptions in a given case, at least where the one bill of exceptions includes all the testimony and proceedings had at the trial.

■ The bill of exceptions is a means (and the only means) of bringing to this court the proceedings in the trial court which do not otherwise appear in the judgment roll. *Tellkamp v. McIlvaine,* 184 Or 474, 199 P2d 246; *State v. Reyes,* 209 Or 595, 303 P2d 519. When signed by the trial judge and filed with the clerk, it "shall be deemed to be a part of the record of the cause" (ORS 19.100-3). It becomes a part of the judgment roll (ORS 18.330-2), and when sent to this court it becomes a part of the transcript on appeal (ORS 19.090). Accordingly when a bill of exceptions is here, it is here for all purposes; and when it includes the entire transcript of testimony and all the proceedings, either appellant may refer to it.

■ If only a short form bill of exceptions is used, as was the practice prior to the 1913 amendment of ORS 19.100, and is still permissible, and in many instances desirable (*Johnston v. Lindsay,* 206 Or 243, 245, 292 P2d 495), then a separate appellant may find it necessary to submit a separate bill of exceptions with the portion of the proceedings necessary to raise the points on which he intends to rely. See *Copper R. & N. Ry. v. Reeder,* 211 F 280, 285 (construing the Alaska Code, which was taken from the Oregon Code.)

■ But when one bill of exceptions has been settled which includes all the testimony and proceedings had at the trial, there is no need for each appellant to submit a duplicate bill of exceptions. See 4 CJS 1304, Appeal and Error § 817.

The motion is denied.

**ON THE MERITS**

*John Gordon Gearin,* Portland, argued the cause for appellant Arnold Hedges. On briefs were Koerner, Young, McColloch & Dezendorf and Joseph Larkin, Portland, and Cunning, Brewster & Copenhaver, Redmond.

*Duane Vergeer* argued the cause for appellant Charles Brohlin. On briefs were Vergeer & Samuels and Charles S. Crookham, Portland.

*Frank H. Pozzi* argued the cause for respondent. On briefs were Peterson & Pozzi and Philip A. Levin, Portland, and William F. Bardwell, Burns.

Before PERRY, Chief Justice, and ROSSMAN, BRAND, WARNER, MCALLISTER and KESTER, Justices.

## ROSSMAN, J.

This is an appeal by the defendants, Arnold Hedges and Charles Brohlin, from a judgment, based upon a verdict, which the circuit court entered in favor of the plaintiff, Elbert McCarty. The action which culminated in the challenged judgment arose out of an injury which the plaintiff, a member of a highway repair crew, suffered when, according to the complaint, the trucks of the two defendants were operated in a negligent manner, with the result that Hedges' truck struck the plaintiff. The defendant-appellant Hedges presents four assignments of error, and the defendant-appellant Brohlin submits two. Before considering them we will report some pertinent facts.

January 12, 1953, the highway repair crew of which the plaintiff was a member was patching pavement of U. S. Highway No. 26. Four miles east of the town of Mitchell, which is in Wheeler county, Highway No. 26 extends in an easterly-westerly direction. It was in that segment that the plaintiff met with his mishap.

The plaintiff described his duties in this manner: "I was the kettleman, running the kettle; look after the oil, and spray the oil on the patch." The oil in the kettle was heated by a burner. A gas motor was used to pump as well as spray the oil. At the time of the accident, the following three pieces of highway equipment stood in the west-bound lane (north half) of the highway: (1) a dump truck which faced east and held

gravel; (2) a two-wheel trailer upon which the kettle was mounted; and (3) a truck which faced west, to which the trailer just mentioned was attached. U. S. Highway No. 26 is hard-surfaced to a width of about 20 feet and has a north shoulder three feet wide. A ditch, about one foot deep, parallels the north shoulder.

The scene of the plaintiff's injury was the ditch just described, at a point opposite the kettle. The plaintiff was working there at the chore of cleaning the sprayer bar. The time of day was close to noon.

When the repair crew stopped its equipment in the highway preparatory to patching the pavement, it set in place four warning signs so as to apprise approaching motorists of the need for caution. Two of the signs, which were placed 50 feet apart, were set approximately one tenth of a mile east of the highway equipment, and the other two, similarly set apart, were about one tenth of a mile west of the equipment. The more distant sign east of the equipment read "Equipment in Road. Men Working." The sign which was 50 feet less distant read "Slow. One Way Traffic Ahead." A flagman by the name of John A. Donnell was stationed in the south half of the road opposite the equipment. A repairman, whose name was Loyd I. King, was in the ditch eight to twelve feet west of the plaintiff. He was also injured. Byron C. Monroe, another member of the crew, was standing between the kettle and the most easterly truck.

A motorist from the east, who was traveling toward the highway equipment, encountered a bridge known as the Keyes Creek Bridge, and, after crossing it, entered a straight section of roadway upon which the equipment was standing 500 feet to the west.

The defendant, Hedges, was driving a loaded logging truck in a westerly direction upon the highway

above described. Defendant Brohlin was also traveling westward and was behind Hedges. His vehicle was a pickup truck which was towing a car. When Hedges came out of the curve which was east of Keyes Creek bridge he noticed the first warning sign, "Equipment in Road. Men Working." At about the same time he saw the equipment in the road and the flagman. The latter testified that he saw Hedges when the latter "came around the curve" and that he held up the slow sign when Hedges was 500 feet from the equipment. The sign was octagonal in shape, 15 inches between parallel sides, and yellow in color. It was mounted on a handle nine inches long. On one side the word "Stop" was lettered in black and on the other side the word "Slow." The letters were five inches high, two and a third to three inches wide.

Hedges swore that he was 300 feet from the equipment when the flagman displayed the slow sign. The flagman testified that when Hedges was 250 feet from the equipment he, the flagman, gave Hedges a signal to come forward. Hedges claimed that he reduced his speed from 20 miles per hour to 15 miles and began to cross into the south lane. The flagman swore that he noticed that Brohlin had pulled into the south lane and that when he observed that movement he displayed his stop sign. According to him, the two defendants were about 200 feet from the equipment when he displayed his stop sign. Hedges supported the flagman's testimony by stating that he saw the stop sign when he was 200 feet from the equipment and that he then glanced into his rear view mirror and saw Brohlin attempting to pass him. He swore, however, that the flagman again signaled to come forward. Brohlin's testimony was to the contrary. He claimed that he saw the sign "One Way Traffic" and the equipment in

the road after he had begun to pass Hedges. According to him, he started to pass Hedges at the turn, approximately 500 feet from the equipment. If he stated the facts correctly, he accelerated his speed to 25 to 30 miles per hour in order to pass Hedges, and actually passed him 400 feet from the equipment. Although he was not positive, he expressed the belief that the flagman displayed the slow sign when he (Brohlin) was 200 feet from the equipment. It was the flagman's testimony that he signaled and continued to signal Brohlin to come forward when Brohlin, having passed Hedges, was 75 feet from the equipment.

Brohlin swore that when he was 50 feet from the equipment, the flagman displayed the stop sign. He was then proceeding at a rate of 10 to 15 miles per hour, so he testified, and was able to stop when he came abreast of the flagman who was standing on the south shoulder of the road opposite the kettle. Brohlin admitted that he did not look to see how far Hedges was behind him when he stopped. The flagman estimated that Hedges was 35 feet from the equipment when Brohlin brought his vehicle to a stop. Hedges' estimate of the distance varied during the course of his testimony from 75 to 100 to 200 feet.

Hedges testified that he was proceeding at 20 miles per hour when he put on his brakes 100 to 200 feet from the front of the gravel truck. He did not, however, "apply" his brakes forcibly until after he had turned to the right and entered upon the north shoulder of the highway immediately in front of the gravel truck. We take the following from his testimony:

"Q In other words, Mr. Hedges, when the pickup truck came to a stop up by this truck you were at that point 200 feet east; is that correct?

"A I think so.

"Q And at that time how fast was your truck going? . . . How fast were you driving your truck then? . . . Can you hear me, sir?

"A About fifteen miles an hour, I think.

"Q About fifteen. All right. And when that truck is going fifteen miles an hour, with a load on it—and you were loaded, weren't you?

"A Yes, sir.

"Q How many feet does it take to stop it?

"A It wouldn't take too much if your brakes wasn't hot.

"Q Were your brakes hot?
"A Why, sure.

"Q You have air on all wheels in the rear on that; is that right?
"A Yes.

"Q If the brakes were not hot, of course you could stop in the truck's length, couldn't you?
"A Yes, sir.

"Q But if the brakes were hot it would take two or three truck lengths, wouldn't it?
"A Yes.

"Q Or more.
"A Or four.

"Q Or four?
"A Yes.

"Q The truck is about 25 feet long?
"A Yes."

The reason for the heated condition of the brakes was this: the truck had just descended a road, nine miles long, which was steep and winding. The pavement was dry and Hedges' load weighed 42,000 pounds. To make matters clear, we again state that as Hedges approached the spot where a moment later the accident occurred, he had seen the flagman, the warning signs and the parked repair equipment.

After Hedges entered upon the north shoulder he saw the men in the ditch, sounded his horn and made a more forcible application of his brakes. The plaintiff was struck by Hedges' truck and was thrown under the kettle.

The charges of negligence which were submitted to the jury are indicated by the following excerpts taken from the instructions which were given to the jury:

"1. That the defendant Hedges was traveling at an excessive speed, in violation of the basic rule.

"3. That he failed to have his truck under proper control; and

"4. He failed to stop, pursuant to a signal of the flagman."

The trial judge added:

"There were other allegations of negligence against the defendant Hedges, which the Court has taken from your consideration."

Then the instructions continued:

"Mr. McCarty also alleges that the defendant Brohlin was negligent in certain particulars:

"1. That he, Brohlin, was driving at excessive speed.

"2. That he failed to keep a proper lookout.

"3. Disregarded the signs and signals, and

"4. Failed to keep his pickup under proper control.

"There is one other allegation of negligence, which I have also taken from your consideration."

The first of defendant Hedges' assignments of error asserts that the trial judge erred when he sustained objections to the questions which we will shortly quote and which were propounded on cross-examination

to Hedges himself. To facilitate an understanding of the situation, we explain that Hedges was called to the witness stand by the plaintiff as an adverse witness. The cross-examination upon which this assignment of error is based, therefore, occurred while Hedges was under examination by his own counsel. The following is the part of the cross-examination upon which this claim of error is based:

"Q Mr. Hedges, what, from your knowledge, based upon your looking back on this particular accident, what could you have done except what you did, at that particular time?

"MR. POZZI: Object, Your Honor—

"THE COURT: Yes. The objection is going to be sustained.

"Q Why did you do what you did?

"MR. POZZI: The same objection.

"THE COURT: It will be sustained also.

"MR. BREWSTER: If the Court please, on this last one we would want to make an offer of proof. That is our special defense."

At that juncture a recess was ordered and in its course counsel for Hedges made this offer of proof:

"If the witness were permitted to answer that question, he would answer that there wasn't anything else that he knew of that he could do, that if he proceeded straight forward he would kill the flagman. If he proceeded down the line, he thought— it was his opinion—he would hit the highway truck head on, and that in his opinion he could go to the bank and not hit any of the state equipment and not hit any human being; and he chose that course of action, acting in an emergency not of his own creation."

The objection to the question and to the offer of proof was made, not only by counsel for the plaintiff, but

also by counsel for the defendant Brohlin. The bases for the objection were "incompetent, irrelevant and immaterial" together with "it invades the province of the jury." A further objection was voiced that "the offer in its form is improper."

■ The first question asked Hedges to look "back on this particular accident" and having done so to tell the jury "what could you have done except what you did." The subject matter of inquiry was not the best course of avoiding the accident as it occurred to the mind of one who had given it three and a half years' reflection, but as it appeared to Hedges when he found himself in the vortex of the imminent disaster. But we do not believe that a court should be finicky with the questions which counsel fashion upon the spur of the moment in their efforts to elicit the facts.

■ The pertinent question, whenever a party urges as a defense for an alleged negligent act that the latter was performed in an emergency, is how the judgment of a reasonable man, in the position of the party who urges the defense, would have been affected by the circumstances, whatever they may have been, that impelled the party to take the course which the other deems negligent. The jury is concerned with what were the circumstances and how they would have appeared to a reasonable man in the position of the accused. Hedges' response to the two questions would have been relevant to a consideration of the circumstances, how they would have appeared to a reasonable man in the position in which Hedges found himself, and whether he (Hedges) noticed all that a reasonable man would have. A party who offers the defense of emergency [not of his own making] may, therefore, testify as to what he observed as the peril intensified

and the course which he took in his effort to avoid injury to others.

The emergency which Hedges says confronted him was the purported fact that the available part of the roadway became suddenly blocked by the presence in it of the flagman and the stopping of Brohlin's vehicle. Over the objections of counsel for the plaintiff and for Brohlin, the defense of emergency was submitted to the jury by instructions which defendant Hedges does not criticize. The trial judge submitted the defense to the jury, notwithstanding the fact that he declared, "In my mind, there is no question at all but that the emergency rule does not apply; * * *."

Defendant Hedges was not prejudiced by the court's ruling which sustained the objections to the proposed questions for two reasons. One of the latter was the fact that the act which Hedges urges he committed in the emergency, and which the plaintiff termed negligent, was not submitted to the jury as one of the specifications of negligence. The other reason is the fact that all of the circumstances which Hedges sought to elicit by the above-quoted questions were fully developed by other questions. After Hedges was called as a witness for the plaintiff, he testified upon cross-examination as follows:

"Q  Why didn't you turn to the left?

"A  Big bank to go over.

"Q  Why didn't you go straight on?

"A  The highway crew was in the right hand lane and the pickup was in the left.  No place to go.

  *   *   *

"Q  What was to the right of this equipment?

"A  There was a barrow pit, and a cut bank."

When Hedges later testified, as a witness in his own behalf, he was permitted, without objection from any source, to state that he did not see the plaintiff until his truck had entered the ditch in which the plaintiff was working. For example, after he had described the manner in which he drove into the ditch and sought to straighten his course, the following occurred:

"Q Then when was it you saw the man you later found to be Mr. McCarty?

"A After I had went into the ditch."

We do not believe that this assignment of error discloses that the appellant Hedges suffered any prejudice through the challenged ruling.

Hedges' second assignment of error asserts that the circuit court erred when it sustained objections to questions which called for the flagman, Donnell, to testify that an "emergency was on hand" and that "unusual circumstances were coming up." The challenged ruling occurred after Donnell had given a detailed account of the manner in which the two vehicles approached the place where he was stationed and he, as flagman, sought to direct their movements. In his narrative he included estimates as to the speed of the two vehicles and the measures which he took when he noticed that at times the one driver or the other was not paying heed to his signals. Donnell was called to the stand by the plaintiff, but the challenged rulings occurred while he was under cross-examination. The part of the cross-examination out of which this assignment arose took place after Donnell had given his portrayal of the operation of the two vehicles. In the following, which is the crucial part of the cross-examination, the names, Pozzi, Brewster and Vergeer,

are, respectively, the names of counsel for the plaintiff, Hedges and Brohlin:

"Q There was an emergency coming up, wasn't there?

"A There was an emergency on hand it seemed to me.

"MR. POZZI: I will object to that, Your Honor.

"MR. BREWSTER: I will ask it differently.

"Q There was an unusual circumstance, at least, coming?

"MR. POZZI: I will object.

"THE COURT: The objection will be sustained.

"Q Was there anything different from ordinary coming up?

"A I would say with—

"MR. VERGEER: I still object, and the witness can say what was coming up and the jury can determine what sort it was.

"THE COURT: I think the objection is well taken.

"MR. BREWSTER: I don't want to be contentious, but—the last question, I think the jury is not entitled to believe that would come up any day in the week.

"THE COURT: The jury can draw their own conclusions about that.

"Q Do you have that sort of thing coming up all the time, every day, every minute of the day?

"A We have traffic approaching—

"Q No, I didn't mean that. What I mean—you have described one truck coming towards you, everything in good order and him 500 feet away; they get up to 250 feet away. You are on a grade, and then another car starts to pass the one that you are signalling through. Does that come up very often?

"A Not very often.

"MR. VERGEER: I object to the question, Your Honor; and move that the answer be stricken. It is entirely immaterial.

"MR. BREWSTER: The jury are entitled to know if that is a usual thing.

"THE COURT: No. I think the jury can probably draw their own conclusions in that respect without testimony from this witness. The answer will be stricken."

The examination of the witness did not disclose that he possessed any qualifications for judging the nature of traffic movements superior to those of the ordinary juror. He had worked for the Highway Commission for only one week before the accident under review occurred. Prior to assuming his position as flagman he had worked in construction employments.

■ Although we believe that the parties were entitled to place before the jury all of the facts concerning the accident which could be gained through an examination of the witnesses, we do not think that the opinions which the challenged questions sought to elicit from Donnell were admissible. For example, we cannot see how it would have been helpful to the jury in determining whether or not Hedges was guilty of negligence to have Donnell say whether or not the scene that lay before his eyes (a) "was an unusual circumstance" or (b) "anything different from ordinary was coming up" or (c) "come up very often." It will be observed that virtually every time the trial judge sustained an objection he pointed out that counsel was entitled to draw out from the witness all of the information concerning the accident which he possessed. When the jury was given all of the facts they were as capable as the witness of determining the issue of negligence. It will be recalled that Donnell's statement,

"there was an emergency on hand" was not stricken, yet the witness' conception of an emergency may have been very different from that which the law of negligence employs. It demands that the emergency must not have been the product of the party's negligent conduct. This assignment of error reveals no merit.

Defendant Hedges asserts in his third assignment of error that the trial judge erred when he sustained an objection made by the plaintiff to the following question addressed upon cross-examination to plaintiff's witness, Loyd King, who, it will be remembered, was a member of the repair crew:

> "Q And you are asking for a considerable sum for damages?
> "A Yes."

What next occurred is shown by the following quotation from the transcript:

> "MR. POZZI: Object as incompetent, irrelevant and immaterial,—the extent of his damages has nothing to do with this case.
>
> "THE COURT: He answered the question; and it will be stricken."

Immediately preceding the question to which the objection was interposed, the following, according to the transcript, took place:

> "Q You are somewhat animus in this? You were injured?
> "A I was.
>
> "Q And you have an action against these same defendants, for the same accident, at the present time?
> "A I have.
>
> "Q And you are represented by the same attorneys, by Mr. Pozzi and Mr. Bardwell?
> "A Yes."

■ It is within the trial judge's discretion to determine what matters may be inquired into for the purpose of showing a witness' hostility. *Furbeck v. I. Gevurtz & Son,* 72 Or 12, 143 P 654, 143 P 922.

The annotation in 74 ALR 1157 states:

"In general, the fact of a relationship or circumstance from which hostility may reasonably be inferred may be shown, but not its details."

*Clevenger v. Schallhorn,* 205 Or 209, 286 P2d 651, held that the trial court erred when it sustained plaintiff's objections to questions directed on cross-examination to a witness who was plaintiff's husband, the response to which would have revealed that the witness had commenced an action on his own behalf against the defendant for personal injuries in the sum of $7,500 general damages and $150 special damages, together with $700 more for damage to his automobile. Further response would have disclosed that the witness, as guardian for his minor son, had commenced a similar action for $5,139 damages. Each of the claims arose out of the same accident upon which the plaintiff depended as the foundation for her action. The decision, however, regarded the error as harmless, for it said:

"* * * The jury was well informed that this witness was very materially interested in the outcome of the case as the husband of the plaintiff, and, further, that he was interested as a guardian in the action brought for and on behalf of his son."

This court found that the witness had testified that he was vitally interested in the outcome of the case and that he had been injured in the same accident. The court also found that, although an objection was raised to the question whether the witness, as guardian,

was asking $5,139 for injuries to his son, the affirmative answer was not stricken and the jury was not instructed to disregard it.

The statement that the trial court committed error in refusing to permit the defendant to cross-examine fully was dicta, for the court also found that, by the witness' previous answers, the jury was well informed that the witness was materially interested in the outcome of the case and was not prejudiced by the ruling which sustained the objection. It further appears that the Clevenger case is distinguishable from the one at bar in this: in the Clevenger case, unlike the one at bar, the witness was not permitted to testify that he had commenced an action against the defendant.

We believe that in the present case the trial court acted within its discretion in ruling upon the extent of inquiry into the witness' interest. Wigmore on Evidence, 3d Ed, § 949; McCormick on Evidence, p 82; and 98 CJS, Witnesses, p 514, § 560(m). No error is revealed by this assignment of error.

The last assignment of error presented by defendant Hedges asserts that the circuit court erred when it overruled his objections to questions which brought forth the fact that he lacked braking power during the last 200 feet before he entered the ditch. The objection was based on the ground that it introduced into the case the question as to whether Hedges' truck had defective brakes, when the complaint did not contain a specification of negligence upon that precise subject. We believe that this assignment of error lacks merit because evidence of the effectiveness of Hedges' brakes was relevant to the averment that he lacked proper control of his truck. *Christianson v. Muller*, 193 Or 548, 239 P2d 835.

Since all of defendant Hedges' assignments of error have been reviewed and have been found lacking in merit, it follows that the judgment against him is affirmed.

Defendant Brohlin's first assignment of error asserts that the trial judge erred when he withdrew from the jury the charge that the plaintiff was guilty of contributory negligence.

■ It will be remembered that the plaintiff's injury befell him while he was standing in the ditch where he was cleaning the spraying bar. The ditch paralleled the north shoulder. We have mentioned the fact that warning signs were in place east and west of the scene of the casualty and that a flagman was stationed only a few feet from the place where the plaintiff was performing his work. The averment of contributory negligence must be based upon either or both of two hypotheses of which we will take notice. Either the plaintiff was negligent in not keeping a constant lookout for approaching automobiles or he was negligent in not looking after he should have heard the sound of the horn or the approach of the truck. The latter hypothesis is based on the premise that he heard the horn or the approach of the truck, or was negligent in not hearing the horn or approach of the truck in sufficient time to get out of its path.

In *Graves v. Portland Railway, Light & Power Co.*, 66 Or 232, 134 P 1, Ann Cas 1915B 500, Mr. Justice McNary, for the court, said:

"* * * It must occur to a reasonable mind that in this age of strenuous endeavor, in order to do efficient work and to scant not the measure thereof, the individual toiler must pursue his employment sometimes to the utter engrossment of his faculties, and, realizing the present necessity

of concentration, the courts of modern thought have announced the rule that those persons engaged in work upon the public streets are not called upon to exercise the same diligence in avoiding accidents as pedestrians who use the street merely as a medium of locomotion: * * *."

An extensive annotation which appears in 5 ALR2d 757, at 769, declares:

"But in most jurisdictions where the courts have expressly discussed the status of the worker, * * * the view has been taken that while a worker must take some care for his own safety, he is not charged with the same degree of care as an ordinary pedestrian, and is not required to keep a constant lookout for vehicles, but may assume that the driver of a vehicle will exercise due care to avoid injury to him, taking into account his required presence in the highway and his probable preoccupation with his tasks."

Under the facts above, we hold that the plaintiff had no duty to keep a constant lookout.

▬ The other hypothesis of negligence assumes that a finding is warranted that the plaintiff should have heard, in time to have got out of the way, the truck or sound of its horn. Such a finding would not have been warranted by the evidence. Although Hedges testified that he sounded his horn, the evidence is indisputable that the sound was not audible above the noise produced by the gas burners and the motor that was used to pump and spray the oil.

The plaintiff was completely off the part of the roadway upon which vehicles traveled and was protected from stray vehicles by the stationed highway repair equipment. The presence of the nearby flagman, whose duty it was to direct traffic so that all could operate in safety, was an additional measure that

could reasonably have induced the plaintiff to believe that no car would endanger him. He had no reason to anticipate that any vehicle would intrude into the area where he was working.

No evidence having been presented upon which the jury could have found the plaintiff guilty of contributory negligence, the trial judge was warranted in withdrawing the charge of contributory negligence from the jury. He was, likewise, justified in refusing to submit to the jury the instructions upon the subject of contributory negligence which had been drafted by counsel for defendant Brohlin.

Defendant Brohlin's second assignment of error urges that the submission to the jury of the charge that he was negligent in having failed to maintain control over his vehicle was prejudicial error because, according to Brohlin, the record contained no evidence capable of supporting the charge.

The evidence upon the matter of control which was most favorable to the plaintiff was that the signalman had displayed his stop sign when Brohlin and Hedges were about 200 feet from the highway equipment. Hedges read the word "Stop." Brohlin swore:

"I think he had the 'Slow' sign up. I am not too positive about that.

"Q You are not positive about that?
"A Not about that."

Brohlin did not respond to the signal as given. From that we may infer either that he did not read the word "Stop", or that he read it but did not understand that it directed him to stop where he was, or that he intended to stop but did not have proper control over his vehicle. Brohlin's testimony supports the first inference. Hedges' testimony, and the inference that if

Hedges could read the sign so could Brohlin, support the second; and the evidence that Brohlin had accelerated to 25 to 30 miles per hour, while towing another car, in order to pass Hedges, after he had been warned of the presence of the highway crew, is relied upon to support the third.

■ It was for the jury to determine what was a reasonable degree of celerity. We are not able to say, as a matter of law, that the fact that Brohlin, while towing another car, accelerated to 25 to 30 miles per hour in order to pass a truck ahead of him, at a time when he was warned of the presence of the highway crew and a condition of one-way traffic, was not evidence of a lack of ability to stop his forward motion with the requisite degree of celerity. Therefore, no error occurred when this specification of negligence was submitted to the jury, it being possible for them to believe that Brohlin's failure to stop when he was signaled to stop was a proximate cause of the injury.

The above disposes of the two assignments of error submitted by defendant-appellant Brohlin. We have found no error.

The challenged judgment is affirmed.