Argued December 8, 1960, modified and remanded March 22,
petition for rehearing denied April 26, 1961

# SCOTT ᴇᴛ ᴀʟ *v.* LAWRENCE WAREHOUSE
## COMPANY

360 P. 2d 610

*Wilber Henderson,* Portland, argued the cause for appellant. With him on the briefs were Wallace, Garrison, Norton & Ray, San Francisco, California.

*Benjamin J. Gantt, Jr.,* Seattle, Washington, argued the cause for respondents and cross-appellants. On the briefs were Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, and Graham, Green & Dunn, Seattle.

Before McAllister, Chief Justice, and Rossman, Perry, Goodwin and King, Justices.

### GOODWIN, J.

Lawrence Warehouse Company, the defendant corporation, appeals from a judgment entered in favor of Karl Scott and John W. Hunter in an action arising out of the inability of the warehouse company to deliver certain lumber represented by warehouse receipts. The plaintiffs cross-appeal.

Lawrence assigns error to certain conclusions of law which imposed liability upon the warehouse. The plaintiffs assign error to other conclusions which limited the amount of their recovery. The cause was

tried to the court without a jury, and judgment was entered upon findings of fact and conclusions of law made by the trial court.

Both parties submitted findings and conclusions to the trial court. All of the assignments of error presented by Lawrence challenge findings and conclusions which were duly objected to during the proceedings below. In order to consider the appeal and, in its turn, the cross-appeal, it is necessary to review the facts which gave rise to the controversy.

The plaintiffs are surviving partners and successors-in-interest of the T. L. Clark Lumber Co., which in 1951 was engaged in the wholesale lumber business in Seattle, Washington. In that year, the Clark Lumber Company numbered among its suppliers of lumber a planing mill operated by one Earl Calder, under the name of Elgin Pine Lumber Sales, near the community of Elgin in Union County, Oregon.

Calder, as he will be referred to hereafter, was in need of financing in order to manufacture lumber under a sales agreement with the Clark Company. The Clark Company obtained a line of credit from the Canadian Bank of Commerce in Seattle, pledging certain individual assets of its partners as collateral. In order to be secured for all funds advanced to Calder and to retain control over such lumber as might be pledged as security while the lumber was on the premises of Calder, the Clark Company and the Bank decided to employ the device of a field warehouse on the site of Calder's mill.

Lawrence was in the business of operating field warehouses in connection with security transactions and was chosen to operate the warehouse. Lawrence thereupon leased a portion of Calder's lumber yard, and for an agreed schedule of payments undertook to

warehouse such lumber as Calder might deliver into the warehouse. Lawrence hired one of Calder's employes as its part-time warehouseman, and paid him $50 per month for his services to Lawrence. Lawrence posted the premises to give notice of the warehousing relationship and commenced issuance of warehouse receipts as Calder delivered lumber into the warehouse.

The financial arrangement was that the Clark Company advanced money to Calder so that Calder could purchase rough green lumber from sawmills. As Calder acquired the rough lumber, it was sorted into piles and deposited in the Lawrence warehouse. When Lawrence received each unit of lumber from Calder, it issued to the Canadian Bank of Commerce a nonnegotiable warehouse receipt which described the lumber deposited in the warehouse.

The warehouse receipts each stated that the lumber was "Received Ex. Elgin Pine Lumber Sales [for] A/C T. L. Clark Lumber Co." Upon receiving advice that warehouse receipts had been issued to the Bank, the Clark Company would extend to Calder credit in a local Oregon bank equal to 65 per cent of the value of the lumber covered by such receipts. Within letters of credit provided by the Clark Company, Calder was permitted to draw sight drafts upon the local bank for operating funds. The original warehouse receipts were delivered to the Canadian Bank of Commerce as additional security for credit contemporaneously extended by that bank to the Clark Company. After Calder had processed the lumber and shipped it to Clark's customers, the Clark Company would deduct the amounts previously advanced and pay Calder the balance of his invoice price for the finished product.

Between April 23 and September 6, 1951, a number of transactions took place according to the gen-

eral plan outlined above. Calder bought unfinished lumber from sawmills, and had it graded and tallied. He then deposited the lumber in the warehouse and drew upon advances from the Clark Company on the basis of warehouse receipts issued by Lawrence. In order to remanufacture the lumber into the grades and dimensions desired by the Clark Company, it was necessary for Calder to withdraw lumber from the warehouse from time to time for processing through his planing mill. Authority to withdraw lumber from the warehouse could be had only by a written order executed by the Bank. During the time the lumber was out from under the control of the warehouse, while it was being processed by Calder, the Clark Company and the Bank continued their security interest in the lumber by ordering Lawrence to release specific lumber, for which Calder then issued processing trust receipts to the Clark Company. Standing behind the acceptance by the Clark Company of each trust receipt was the reliance by Clark upon the event of the same lumber being released from the warehouse. These trust receipts are involved indirectly in part of the judgment challenged in the appeal by Lawrence, and are relied upon in part by the plaintiffs in connection with the cross-appeal.

This litigation arises out of the fact that the Clark Company and the Bank came into possession of, and extended credit upon, warehouse receipts representing more lumber than was available for redelivery upon written orders from the Bank.

■ On September 6, 1951, a fire destroyed or damaged a portion of the lumber in the warehouse. An inventory taken in settling the fire insurance claims revealed that prior to the fire there was not as much

lumber in the warehouse as was represented by warehouse receipts held by the Bank. The fire loss has been paid and is no longer relevant, except that the fire fixed the date when the probability of other shortages became known to all parties. The shortage upon which the trial court based its findings was proven by substantial evidence. The plaintiffs proved a total difference between lumber on hand in the warehouse and lumber represented by outstanding warehouse receipts of a value of $60,694.64 out of $67,270.64 alleged in the complaint. As a determination of a disputed question of fact, the finding by the trial court is conclusive when supported by substantial evidence. *Berliner v. Hill*, 221 Or 475, 351 P2d 692; *Honeywell, Admx. v. Turner et al*, 214 Or 700, 705, 322 P2d 638; *McCulloch v. Kollock*, 147 Or 283, 32 P2d 770.

Judgment was entered for the plaintiffs, however, in the amount of only $21,322.84, plus interest, on their cause of action which sought to recover the full value of the shortage. Lawrence appeals and the plaintiffs cross-appeal from this part of the judgment. The plaintiffs also recovered on two other causes of action. Lawrence appeals from these portions of the judgment also. Each will be considered in turn.

While there are a number of collateral issues which must be considered in connection with the appeal and cross-appeal, the principal question for decision is whether Lawrence should be required to stand behind any or all of its warehouse receipts under the circumstances of this case.

Lawrence presents two defenses: First, that the plaintiffs have no standing to sue upon the warehouse receipts; and second, that the shortages were caused by inaccuracies in the certificates of delivery executed

by Calder and upon which Lawrence relied in issuing the warehouse receipts to the Bank.

In support of its first proposition, Lawrence contends that Scott and Hunter have no standing to prosecute the action because they failed to prove an assignment of the warehouse receipts from the Bank to the plaintiffs.

■ No written assignment was necessary. The Bank delivered the warehouse receipts to the plaintiffs as successors-in-interest of the Clark Company, which had originally pledged them to the Bank. The Bank, at the request of the Clark Company, was named on each receipt as the party to whom the receipts were issued. When it became apparent that Calder's affairs were somewhat involved, the Bank called upon the Clark Company to repay all sums advanced by the Bank.

The dissolution of the Clark partnership made it necessary for the plaintiffs to wind up its affairs. Scott and Hunter personally paid the balance due the Bank, and the Bank delivered the outstanding warehouse receipts to them. The Bank then had no further interest in the warehouse receipts. The remaining partners in the Clark Company executed assignments to the plaintiffs.

Scott and Hunter are transferees of nonnegotiable warehouse receipts. It might be added that the plaintiffs are transferees for value, although no issue has been presented upon that fact. The plaintiffs acquired all the interest of the Bank by delivery of the receipts, ORS 74.390, RCW 22.04.400, and all the interest of the Clark partnership by written assignment.

Under Section 42 of the Uniform Warehouse Receipts Act, a person to whom a receipt has been transferred but not negotiated acquires thereby "the right to notify the warehouseman of the transfer to him of

such receipt, and thereby to acquire the direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt * * *." ORS 74.420; RCW 22.04.430.

In *Edward L. Eyre & Co. v. Hirsch,* 36 Wash2d 439, 218 P2d 888, the Washington court said:

"There is some conflict of authority as to whether a warehouse receipt is or is not a 'symbol' of the goods.

"In Jones on Collateral Securities (3d ed.) 332, § 280, appears the following text:

" 'Warehouse receipts by custom have long been considered as representing the property mentioned in them; and the assignment or indorsement of such instruments has long been regarded as equivalent to the delivery of such property . . . . The delivery of the symbol of the property was as effectual as an actual delivery of the property itself.' " 36 Wash2d at 452.

Under the quoted statute, the plaintiffs are the proper parties to bring this action. It remains to be decided whether the rights of such transferees may be subject to a defense which might have been available against the depositor.

The second and principal ground of the defendant's appeal is that even if the plaintiffs now have the same rights against Lawrence which the Bank formerly had under the warehouse receipts, the plaintiffs are not entitled to recover. The rights of the Bank under non-negotiable warehouse receipts in cases of this character are derived from the Uniform Warehouse Receipts Act (ORS ch 74 and RCW ch 22.04). The position of the bank in such cases is set forth in *Lawrence Whse., Inc. v. Best Lbr. Co., Inc.,* 202 Or 77, 271 P2d 661, 273 P2d 993. There Lawrence had paid the bank

and was suing the depositor to recover for a loss caused by inflated certificates of deposit. We said:

"* * * The rights of the bank as holder of the nonnegotiable warehouse receipts were measured by the statutes. A nonnegotiable receipt is one in which it is stated that the goods received will be delivered to the depositor or to any other specified person. ORS 74.040. The bank was the 'specified person.' * * * The bank innocently lent money to the defendant upon the security of the warehouse receipts. It did not seek to vary the terms of the receipts. It insisted upon its rights under those terms. One of those rights was to enforce the liability of the warehouse company for damages caused by the nonexistence of part of the goods covered by the receipts. ORS 74.200. The plaintiff recognized its liability and paid the bank the value of the logs which it could not deliver but which it was bound to deliver under its receipts." 202 Or at 95.

The question now is whether the Bank, or a transferee standing in the Bank's position, can enforce the receipts according to their terms. Lawrence insists that it is excused from making delivery because it issued the warehouse receipts in reliance upon representations of quantity which were made to Lawrence by Calder. Lawrence contends that this excuse follows from substantial evidence that Calder was the agent of the Clark Company for the purpose of depositing lumber in the warehouse. Certificates of quantity were required of Calder for each deposit. It then follows, Lawrence urges, that it has the same defense against Clark, and, in turn, against the Bank, as it would have had against Calder.

If this contention were literally true there would have been no need to involve a warehouseman in the security arrangements between Calder and the Clark

88

Company. Responsibility was the essence of the arrangement, for which the Clark Company guaranteed the payment by Calder of all warehousing fees. Money was being advanced on the basis of the Lawrence Warehouse receipts and not on the basis of Calder's representations of quantity. See *Lawrence Whse., Inc. v. Best Lbr. Co., Inc.,* supra. In any event, it is not necessary to decide whether Calder was the agent of the Clark Company in this case because there was no finding that Calder falsely certified the volume of lumber deposited by him. There was no evidence at all to prove the cause of the shortage. There was merely speculation concerning a number of possible causes. The trial court properly found as a matter of fact that the shortage has never been explained. *Lawrence Warehouse Company v. Nasif,* 219 F2d 536, 538 (5th Cir, 1955).

 A warehouseman is not the insurer of goods stored with him. He is only liable for losses due to his own fault. In this respect the Uniform Act has not changed the common law. *Voyt v. Bekins Moving & Storage,* 169 Or 30, 119 P2d 586, 127 P2d 360; *Hansen-Rynning v. Oregon-Wash. etc. Co.,* 105 Or 67, 209 P 462; *Hansen v. Ore-Wash. R. & N. Co.,* 97 Or 190, 188 P 963, 191 P 655; *Friednash v. Lawrence Warehouse Co.,* 121 Cal App2d 202, 263 P2d 45 (1953). However, once the depositor or receipt-holder has proven a loss, the burden is on the warehouseman to show his freedom from fault. ORS 74.210 and 74.080. Section 21 of the Uniform Act (ORS 74.210 and RCW 22.04.220) imposes the duty of reasonable care. Since the law is the same in both Oregon and Washington it is not necessary to consider which law applies to this interstate transaction.

ORS 74.080 (RCW 22.04.090) provides:

"A warehouseman, in the absence of some lawful excuse provided by this chapter, is bound to deliver the goods upon a demand made either by the holder of a receipt for the goods or by the depositor, if such demand is accompanied with:

"(a) An offer to satisfy the warehouseman's lien;

"(b) An offer to surrender the receipt, if negotiable, with such indorsement as would be necessary for the negotiation of the receipt; and

"(c) A readiness and willingness to sign, when the goods are delivered, an acknowledgment that they have been delivered, if such signature is requested by the warehouseman.

"In case the warehouseman refuses or fails to deliver the goods in compliance with a demand by the holder or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal."

Lawrence has been paid for its services, and there is no question of the plaintiffs' willingness to acknowledge deliveries actually made. Lawrence denies liability for the shortage on the sole ground that it has a lawful excuse for its failure to deliver under ORS 74.080.

Lawrence has not shown, however, that the shortage was caused by factors consistent with its due care. Several of the Lawrence witnesses speculated that the shortage might have been caused by Calder's overestimation of his own deposits, but they admittedly had no personal knowledge of the amounts deposited by Calder. The existence of the shortage was proven to the trial court's satisfaction. But the record reveals no direct evidence that Calder misrepresented the amounts of his deposits. Neither party called Calder

as a witness. The record does not tell us why. He was named a party defendant but was not served.

The warehouse in this case was in operation for five months. There were deposits and deliveries of hundreds of thousands of board feet of lumber before a shortage was discovered. The fact alone that a shortage did occur would not justify the conclusion that Calder misrepresented his deposits. This could have been a cause of the shortage. Other causes are equally likely. Unauthorized withdrawals were suggested. For such a case, see *Friednash v. Lawrence Warehouse Co.,* supra. No cause was shown, but the burden of proving that the missing lumber was never deposited, or was misrepresented by Calder, was on the defendant. The mere existence of the shortage at a later date was not such proof.

The burden and degree of proof are governed by the policy and purpose of the law. 9 Wigmore, Evidence (3d ed) 274-278, § 2486. There are sound reasons for imposing upon the warehouseman the burden of excusing a loss. The rule tends to safeguard the warehouseman's integrity because it discourages fraud. Further, the rule justifies the existence of the field warehouse. If it did not have to account for a loss there would be no particular reason to employ its services. A proper distribution of risk requires that one who holds himself out in the business of storing goods for profit should bear the risk for any lack of due care in the conduct of his business. The warehouseman ordinarily is in a better position to know and explain the causes of loss than is either the depositor or the receipt-holder. Finally, the warehouseman is in the best position to prevent shortages.

The last-mentioned reason for the rule was well

expressed by the court in *Rustad v. Great Northern Ry. Co.*, 122 Minn 453, 456, 142 NW 727:

"* * * Considerations of fairness put upon the warehouseman the burden of proving his own freedom from negligence. The goods are intrusted to him. He has charge and control of them. He determines the manner of keeping them. He is in possession of such evidence as there is as to the circumstances attending the loss. The bailor trusts the warehouseman and has no proof. It is not unjust to the warehouseman to require him to sustain the burden * * *."

■ The trial court correctly found that Lawrence had failed to prove a valid excuse for the nondelivery of the lumber represented by the receipts which it had issued in commercial channels. This finding of fact is fully supported by evidence. The resultant conclusion which imposed liability upon the warehouse company must be affirmed.

Lawrence has also assigned error to such findings and conclusions as support a judgment in favor of the plaintiffs on a separate cause of action for the restitution of fees and charges demanded by Lawrence and paid under protest by the plaintiffs. Lawrence demanded substantial extra payments as a precondition to delivery by Lawrence of certain lumber which was within the possession of Lawrence but which had not been deposited under warehouse receipts.

After a dispute arose between the Clark Company and the warehouse, Lawrence asserted a lien upon all lumber within the lumber yard, claiming warehouseman's fees. Lawrence asserted its lien for storing and handling the full amount of lumber covered by its warehouse receipts, and also for the full amount of extra expense Lawrence incurred in connection with the problems of the warehouse which arose out of the

shortage. The trial court allowed partial restitution in the amount of $1,539.92, which it found to be an overcharge. The question was primarily one of fact. There was no error in allowing the plaintiffs to recover for the overcharge. A clerical error of $3.86 in the judgment as entered below should be corrected to render judgment on this cause of action in the sum of $1,536.06.

Lawrence further appeals from that part of the judgment which awarded the plaintiffs $647.07 in consequential damages for the wrongful delay in delivering certain lumber to which the Clark Company was admittedly entitled. Again, there was ample evidence to support the trial court's finding, and the assignment of error is without merit.

In view of our disposition of the contentions made by Lawrence in its appeal from the judgment for the plaintiffs, the appeal is not well taken and the judgment is affirmed, subject to the additions which must be made thereto by reason of items which the trial court refused to allow, and from which refusal the plaintiffs have cross-appealed.

Turning now to the plaintiffs' cross-appeal, it is necessary briefly to supplement the condensed factual outline set forth in connection with the defendant's appeal. It will be remembered that after Calder deposited rough lumber in the warehouse, he could not remove it for processing without an order from the Bank releasing specific lumber by description and warehouse receipt number. Each of these orders was referred to by the parties as an "Order for Warehouse Release."

Between September 15, 1951, and November 5, 1951, Lawrence refused to permit lumber to be taken from the warehouse (except for three deliveries) in spite

of repeated demands by the Clark Company, and in spite of the fact that additional "Order[s] for Warehouse Release" had been issued by the Bank. The Clark Company's right to make such demands is not now in question. The lumber had been deposited for the account of the Clark Company, as stated in the warehouse receipts; Clark Company paid the storage charges; and the releases executed by the bank authorized delivery to the Clark Company. Thus Lawrence refused to deliver any lumber, despite the business needs of its depositor and his lenders, while the warehouse agents were investigating and attempting to deal with a shortage that was Lawrence's responsibility.

After November 5, 1951, Lawrence would not allow any lumber to be taken from the warehouse without receiving in each case a new "Order for Warehouse Release", even though some of the lumber had been stored in the warehouse area without the issuance of receipts. "Order[s] for Warehouse Release" had previously been given by the Bank for other, receipted lumber which the defendant had not delivered and still possessed in its warehouse. "Order[s] for Warehouse Release" were required under the warehousing agreement only for lumber which had been deposited under warehouse receipts. The purpose of these forms was to balance outstanding receipts with corresponding releases.

■ By requiring releases for lumber for which no receipts had been issued and for receipted lumber that previously had been ordered released but never delivered, the defendant apparently intended to recapture the shortage and make its receipts and releases balance. The trial court could have found this to be a fact upon the testimony of the defendant's manager

alone. Such unilateral action clearly was unjustified. *Lawrence Warehouse Company v. Twohig*, 224 F2d 493, 498.

By August 1, 1952, all of the lumber in the warehouse was delivered out of the warehouse, and it was closed. Warehouse receipts were outstanding in two general classifications which might be termed "released" and "unreleased". The quantities of lumber for which receipts had been issued but which remained undelivered and the value thereof as found by the trial court are as follows:

| | |
|---|---|
| 331,093 BF pine lumber on warehouse receipt, not released | $18,173.34* |
| 22,500 BF 5/4 shop, not under warehouse receipt but wrongfully impounded | 3,150.00 |
| (Recovery allowed for this total: | $21,323.34) |

and the following shortages and values for which recovery was not allowed:

| | |
|---|---|
| 52,507 BF pine lumber | $ 5,966.26 |
| 48,696 BF 8/4 fir and spruce | 2,191.32 |
| 41,750 BF 8/4 fir and spruce | 1,461.25 |
| 116,805 BF white fir | 5,256.22 |
| 48,350 BF 8/4 fir and spruce | 2,175.75 |
| 28,300 BF 5/4 shop and moulding and better pine lumber | 3,962.00 |
| 144,000 BF No. 3 and better common pine lumber | 13,104.00 |
| 33,900 BF 4/4 moulding and better pine lumber | 5,254.50 |
| Total shortage for which recovery was not allowed: | $39,371.30 |

---

* Through a clerical error, the trial court showed this figure as $18,172.84.

The plaintiffs held warehouse receipts for 331,093 board feet of pine lumber valued at $18,173.34 which previously had not been ordered by the Bank to be released. "Order[s] for Warehouse Release" have been issued for all of the lumber represented by the remaining receipts. In exchange for these orders releasing lumber to Calder, the Clark Company received from Calder the trust receipts previously mentioned. The trial court gave judgment for plaintiffs on the unreleased warehouse receipts, but refused to hold Lawrence liable for undelivered lumber under the remaining warehouse receipts, with this exception:

On September 24, 1951, pursuant to "Order[s] for Warehouse Release", Calder removed 22,500 board feet of pine lumber from the warehouse. Calder then issued "processing" trust receipts to the Clark Company. Thereafter Lawrence required Calder to return the lumber to the warehouse under the threat that it would otherwise make no other deliveries. After Calder returned the lumber, Lawrence refused to redeliver it without additional "Order[s] for Warehouse Release." This lumber was valued at $3,150, and the trial court allowed plaintiffs that amount as holders of the trust receipts which were issued after Calder took possession.

The trial court did not allow plaintiffs to recover as holders of "processing" trust receipts for the remaining released but undelivered lumber for the reason that Calder had never taken possession of this lumber from the warehouse so as to qualify him to issue trust receipts. *In re Chappell,* 77 F Supp 573, 575 (DC Or 1948).

■ We agree with the trial court in holding that the plaintiffs acquired no additional rights against Lawrence by virtue of Calder's purported processing trust

receipts. However, Lawrence was not relieved of its liability upon its outstanding warehouse receipts merely because Calder attempted without obtaining possession of the property to issue trust receipts upon property covered by warehouse receipts. The extended briefs and authorities on the law of trust receipts are largely beside the mark. The plaintiffs are standing on their rights against Lawrence as the issuer of warehouse receipts as well as against Lawrence for detaining property covered by trust receipts. Their right to recover on the warehouse receipts makes it unnecessary to consider the trust receipts further.

The warehouse receipts and the "Order[s] for Warehouse Release" in this case are separate documents. Both are on forms provided by the Lawrence Warehouse Company. Each lists the goods receipted or released from a given receipt. The warehouse receipts list the goods as "Received Ex. Elgin Pine Lumber Sales [for] A/C T. L. Clark Lumber Co. For Storage in Elgin, Oregon Warehouse No. 3 * * * for the account of and to be delivered without surrender of this Warehouse Receipt upon written order of CANADIAN BANK OF COMMERCE Seattle, Wn." "Non-Negotiable" is printed across the receipts. They are signed: "Lawrence Warehouse Company Per H. R. Stubblefield Bonded Warehouse Manager."

The "Order[s] for Warehouse Release" state: "LAWRENCE WAREHOUSE COMPANY * * * You are hereby authorized to deliver to the T. L. Clark Lumber Company the following Merchandise, which is held in storage in your Elgin, Oregon, Warehouse No. 3 under (negotiable) (non-negotiable) WAREHOUSE RECEIPTS assigned to, and/or held by us as indicated below." Then the goods are listed and totaled.

Finally the form states: "The release hereby authorized shall be effective only when merchandise is actually delivered. The authority to deliver may be revoked in writing, subject to deliveries made prior to receipt by you of revocation." Signed: "Canadian Bank of Commerce Warehouse Receipt Holder". Since the form was prepared by Lawrence, and on its face has no effect until lumber is actually delivered, the unacted-upon "Order[s]" did not relieve Lawrence of liability for nondelivery. Counsel for Lawrence advised the trial court: "The releases never contemplated that they would take effect until the stuff went out of there." Accordingly, it is no defense to a proven nondelivery to say that Lawrence held releases for lumber which was not in fact delivered.

What is termed a "release" is frequently a written contract to terminate a liability. In such a case the writing itself extinguishes the liability. *Coopey v. Keady*, 73 Or 66, 144 P 99. "Order[s] for Warehouse Release" are not releases of this kind. They do not purport to be contracts. No consideration passes for them from the warehouseman to the receipt-holder. For the necessity of consideration to release a liability, see *Hansen v. Oregon Humane Soc.*, 142 Or 104, 18 P2d 1036. Delivery cannot be such consideration in this case for several reasons: The warehouse was already bound to deliver on demand to the receipt-holder. ORS 74.080. When the warehouseman has delivered the goods on demand, he has performed his contract; he has not been released from it. Delivery is just what the plaintiffs proved did not occur in this case.

■ The "Order[s] for Warehouse Release" are rather what they appear to be: formal demands by the receipt-holder to the warehouseman to deliver. It is

patent from the words of the "Order[s]" themselves that none of the warehouseman's obligations under the warehouse receipts are to be terminated until delivery is made. For these reasons the "Order[s] for Warehouse Release" in this case do not discharge the rights and obligations under the warehouse receipts, and the plaintiffs, as the present receipt-holders, can enforce them. An "Order for Warehouse Release" is (1) a formal demand imposing the duty on the warehouseman to deliver the goods, and (2) evidence of redelivery when filed in the regular course of business. In this case, the outstanding warehouse receipts stood as evidence of deposits without corresponding evidence of delivery. Nondelivery and failure to explain the shortage in a manner consistent with the warehouseman's duty of due care constitute the foundation for the liability of the warehouse.

■ The court below was of the opinion that plaintiffs could not recover for two items of fir and spruce lumber for the reason that Lawrence had delivered to Calder some 242,768 board feet of spruce and fir for which it had not issued warehouse receipts. It was apparently a common practice for Calder to store occasional loads of lumber in the warehouse and for the warehouse to deliver such lumber to Calder without the issuance of either receipts or releases. This practice may have been part of the reason for the subsequent shortage that developed. The evidence did not explain it fully. However, lumber that was neither receipted nor released was not covered by the pleadings, and could have had no bearing upon the rights of the parties arising out of the warehouse receipts under the present state of the record. It was error to allow Lawrence a credit based upon the delivery out

of its yard of lumber it had no right to impound in any event.

Lawrence makes two procedural objections to the plaintiffs' cross-appeal: (1) that plaintiffs filed no bill of exceptions; and (2) that plaintiffs did not object within ten days to the findings of fact and conclusions of law made by the trial court.

■ The cases of *Kraft v. Montgomery Ward & Co., Inc.,* 220 Or 230, 315 P2d 558, 348 P2d 239, and *McCarty v. Hedges,* 212 Or 497, 309 P2d 186, 321 P2d 285, held: "* * * Where one appellant has filed a bill of exceptions containing all of the proceedings at the trial, a cross-appellant may rely upon it in this court and need not file a duplicate. Ordinarily, the party first giving notice of appeal is treated as the primary appellant, and he assumes the burden of initiating the bill of exceptions." *Kraft v. Montgomery Ward & Co., Inc.,* supra, 220 Or at 232-233. The above-mentioned rule has been codified in ORS 19.084. The bill of exceptions filed on appeal in the case at bar contains all of the proceedings below.

■ In reply to the second objection, plaintiffs point out that they are appealing from the judgment on the first cause of action, which exonerated the defendant of liability for part of the shortage, not from findings of fact which underlie the judgment. Most of the findings of fact adopted by the trial court were submitted by the plaintiffs. ORS 17.430, both before and after the 1959 amendment, provides ten days as the period within which objections may be made to findings of fact. The plaintiffs quite naturally did not object to the findings of fact as such. Nothing in ORS 17.430 changed the then 60 days within which a party could appeal from a judgment. ORS 19.026 has since reduced this period to 30 days. However, under the

statutes applicable at the time the cross-appeal was taken, the cross-appeal was timely. The plaintiffs correctly point out that the language "The defendant is not liable to the plaintiffs for the value of this lumber" in several of the findings made by the trial court is a conclusion of law. The cases cited by Lawrence concern failure to object to findings of fact. The plaintiffs did not waive their right to cross-appeal by failing to file an objection to such a "finding".

■■■■■■ If no objections are taken to findings of fact, where the court tries the case without a jury, the findings of fact are conclusive. *Mullennex v. Draper,* 220 Or 1, 3, 347 P2d 990. In such a case, erroneous rulings upon questions of law may be appealed only on the ground that the established facts cannot support the judgment. The only question on this cross-appeal is, then, whether the facts support the judgment. *McPherson v. State Ind. Acc. Com.,* 169 Or 190, 196, 127 P2d 344.

In this case, the facts support a judgment for the plaintiffs in the full amount of the proven shortage. The trial court erroneously denied a substantial part of the recovery to which the plaintiffs were entitled on the facts. To that extent the judgment entered was not supported by the established facts.

Plaintiffs are entitled to recover the proven value of the entire shortage, $60,694.64, in addition to $647.07 for consequential damages and $1,536.06 in restitution of excessive charges. Interest on each amount should be allowed from the dates set forth in the judgment.

■■■ All questions of fact having been resolved by the trial court, and the legal consequences of the established facts having been set forth above, there is no need to remand the cause for another trial. Oregon

Constitution, Art VII, § 3; *Tucker v. State Ind. Acc. Com.,* 216 Or 74, 83, 337 P2d 979. Accordingly, the cause is remanded to the circuit court with instructions to vacate the judgment heretofore entered and to enter a judgment in the amounts indicated herein.

Modified and remanded.